IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARK and ANN SCHRAY, )
                                      )
              Plaintiffs, )     Case No. 04-1777-KI
                                      )
    vs. )     OPINION AND ORDER
                                      )
FIREMAN'S FUND INSURANCE CO., )
a foreign corporation, )
                                      )
              Defendant. )

        J. Lee Street
        Dean E. Aldrich
        The Aldrich Law Office, P.C.
        522 S. W. Fifth Avenue, Suite 1230
        Portland, Oregon 97204

             Attorneys for Plaintiffs

        John A. Bennett
        Margaret M. Van Valkenburg
        Bullivant Houser Bailey PC
        300 Pioneer Tower
        888 S. W. Fifth Avenue
        Portland, Oregon 97204-2089

             Attorneys for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiffs Mark and Ann Schray's home was sided with a synthetic stucco product which failed after improper installation, leading to extensive damage to the home. To recover the money spent on repairs, the Schrays filed a claim against their homeowner's policy. The insurer denied coverage. In this action, the Schrays sue the insurer seeking coverage under the policy. Before the court is Defendant's Motion for Summary Judgment (#24). For the reasons below, I deny the motion.

## FACTS

The insurer moves to strike paragraphs 7 to 16 of the McGarrigle Declaration. Because Roger McGarrigle, a structural engineer, did not conduct any testing of the structural components of the Schray house, the insurer argues that McGarrigle does not adequately support his opinion. The insurer also moves to strike paragraphs 5, 6, 8, and all references to "collapse" in the Ghores Declaration. The insurer contends that Sean Ghores, the owner of the construction company that repaired the Schray's house, is not qualified to give an opinion on the structural soundness of the house.

I deny the motion to strike. Although the insurer's arguments may lead to persuasive cross examination, the declarations are not so inadequately supported, based on the declarants' professions, that they must be struck.

The Schrays completed construction of their house in 1994. The exterior of the house was clad with an Exterior Insulation Finish System ("EIFS"), a type of synthetic stucco siding. The Schrays observed no problems with the EIFS prior to 2003, including no evidence of water intrusion, damage, or other structural issues. They never moved out of the house during any of

the events described below. The house was insured by policies issued by American Automobile Insurance Company, one of the Fireman's Fund Insurance Companies.

The policy contained the following terms:

**POLICY SECTION I – YOUR PROPERTY**

. . . .

**Coverage A – Dwelling –** Under Coverage A, we cover:

a. The dwelling on the "residence premises" shown in the Declarations; including structures attached to the dwelling; . . . .

. . . .

**Additional Coverages**

. . . .

9. **Collapse**

We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

. . . .

b. Hidden decay;

c. Hidden insect or vermin damage;

. . . .

f. Use of defective material or methods in construction, remodeling or renovation; but only if the collapse occurs during the course of construction, remodeling or renovation.

. . . .

Settling, shrinking, bulging or expansion (including cracking which results) are not collapse.

. . . .

**SECTION I – PERILS INSURED AGAINST**

We insure against risks of direct physical loss to property described in Coverages A, B and C unless the loss is excluded in Section I Exclusions – Loss Not Insured.

**SECTION I EXCLUSIONS – LOSS NOT INSURED**

1. **We do not insure for loss caused by:**

a. Or involving collapse, except as provided in Additional Coverage 9;

. . . .

d. Any of the following:

. . . .

(2) Inherent vice, latent defect, mechanical breakdown;

(3) Smog, rust or other corrosion, mold or other fungi, wet or dry rot;

. . . .

(6) Settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs, or ceilings;

(7) Birds, vermin, rodents or insects; or

. . . .

3. **We do not insure for loss caused by any of the following. However, any ensuing loss not excluded in this policy is covered.**

. . . .

c. **Faulty, inadequate or defective:**

. . . .

>    (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
>    (3) Materials used in repair construction, renovation or remodeling; or
>
>    (4) Maintenance;
>
>    . . . .
>
>    **Special Provisions – Oregon**
>
>    . . . .
>
>    8. **Suit Against Us**
>
>    No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss.

Van Valkenburg Aff. Ex. 4 at 13, 16, 17, 18, 19, 20, 47 (emphasis in the original).

After learning of a colleague's problem with the faulty application of EIFS siding, the Schrays had their home inspected by Western Architectural in early January 2003. The inspection found that the EIFS, flashing, and windows had been improperly installed, allowing moisture to get behind the EIFS cladding. The Schrays decided that the EIFS would need to be completely replaced. They paid Ghores Construction, Inc. over $490,000 for the repairs, with $225,000 of that amount to repair damage involving collapse caused by hidden decay as well as building code compliance issues. The Schrays paid to have the house resided with vertical cedar siding and sued the builder for the cost. The case was settled and the Schrays received approximately $365,000 from the builder and third-party defendants.

Roger McGarrigle, a structural engineer, visiting the Schray house on multiple occasions during the reconstruction. According to McGarrigle, removal of the wall cladding revealed significant rot and decay of some structural members of the house, resulting in substantial

impairment to those parts of the building beginning on April 1, 2003. Decay resulted in extensive property damage involving collapse to parts of the building, imminent collapse within a year to other parts of the building, and a collapsed state, defined to be falling into pieces, to other parts of the building. Sean Ghores is the principle of Ghores Construction, Inc. the repair contractor at the Schray house. Ghores also observed the damage during the repairs. He generally agrees with McGarrigle's opinions.

The parties agree that it is possible to examine a decayed framing member and perform an engineering analysis to determine the extent to which its load carrying capacity has been compromised by rot or decay. The insurer's expert, Joseph Bozick, a structural engineer, calculated the load carrying capacity of the framing members in the Schray house and concluded that the house was not in danger of physically collapsing within a year of when the photographs were taken during reconstruction.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

# DISCUSSION

The insurer contends that coverage is not available under the "collapse" provision because the house neither collapsed nor suffered structural damage requiring the Schrays to move from the house until it was repaired. The insurer notes case law holding that even serious settling and cracking do not constitute collapse. Because the Schrays' policy did not provide coverage for *risks* of physical loss, the insurer distinguishes cases which expand the definition of collapse coverage to substantial impairment of the structural integrity of the building or to imminent collapse.

The Schrays argue that the terms "collapse," "involving collapse," and "direct physical loss involving collapse" are ambiguous. They note what they call the clear majority trend to hold that collapse coverage provisions provide coverage if there is substantial impairment to the structural integrity of a building or any part of a building. The Schrays ask the court to adopt this view when construing the policy and point to the Honorable Ancer Haggerty's decision doing so in Richardson v. Travelers Property Casualty Insurance Co., No. CV03-1185-HA, 2004 WL 1173186 (D. Or. May 25, 2004). To support their argument that the phrase is ambiguous, the Schrays point to other courts defining the term "collapse" to mean imminent collapse.

Under Oregon law, the interpretation of a contract is a question of law for the court. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). The court's goal is to give effect to the intention of the contracting parties. Anderson v. Jensen Racing, Inc., 324 Or. 570, 575-76, 931 P.2d 733 (1997); ORS 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible)).

"To interpret a contractual provision, . . . the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole." Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). "If the provision is clear, the analysis ends." Id. "When considering a written contractual provision, the court's first inquiry is what the words of the contract say . . . . To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law." Id. (quoting Eagle Industries, Inc. v. Thompson, 321 Or. 398, 405, 900 P.2d 475 (1995)).

A contract or term is unambiguous if it has only one sensible and reasonable interpretation. D&D Co. v. Kaufman, 139 Or. App. 459, 462, 912 P.2d 411 (1996). For a contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996).

If the contractual provision at issue is still ambiguous after examining the text and its context, the second step "is to examine extrinsic evidence of the contracting parties' intent." Yogman, 325 Or. at 363. In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence. Moon, 140 Or. App. at 407; see also Adams v. Knoth, 102 Or. App. 238, 243-44, 794 P.2d 796 (1990) ("[i]n deciding if the language of a contract is ambiguous, it is proper for the court to consider extrinsic evidence regarding the circumstances

under which an agreement was made or to which it relates."). The parties' "practical construction of an agreement may hint at their intention." Yogman, 325 Or. at 364.

If the first two analytical steps have not resolved the ambiguity, the court proceeds to the third and final analytical step: the use of "appropriate maxims of construction." Id. This can includes the rule that the terms of a contract are construed against the drafter of the language. Hoffman Construction, 313 Or. at 470.

Presumably, if the language is still ambiguous, then what the parties intended by that language is to be decided by the trier of fact. See Oregon School Employees Ass'n v. Rainier School District No. 13, 311 Or. 188, 194, 808 P.2d 83 (1991) ("[i]f [contract terms] are ambiguous, then the trier of fact is to ascertain the intent of the parties and construe the contract consistently with their intent."); Yogman, 325 Or. at 364.

The insurer agrees that the exclusions for rot, mold, and faulty workmanship do not apply if the collapse coverage is triggered.

I agree with Judge Haggerty's conclusion in Richardson, 2004 WL 1173186, *3, that the issue was not addressed in Montee v. State Farm Fire and Casualty Co., 99 Or. App. 401, 782 P.2d 435 (1989). Montee addressed "collapse" in conjunction with an ensuing loss provision. Thus, there is no Oregon case law to guide me.

Federal courts are bound by pronouncements of the state's highest court on applicable state law. If the state's highest court has not decided an issue, the federal court is to predict how the state high court would resolve it. "In assessing how a state's highest court would resolve a state law question – absent controlling state authority – federal courts look to existing state law

without predicting potential changes in that law." Ticknor v. Choice Hotels International, Inc., 265 F.3d 931, 939 (9th Cir. 2001), cert. denied, 534 U.S. 1133 (2002).

Richardson and Assurance Company of America v. Wall & Associates LLC of Olympia, 379 F.3d 557 (9th Cir. 2004), both construed the language, "loss or damage caused by or resulting from *risks of* direct physical loss involving collapse of a building or any part of a building . . . ." Richardson, 2004 WL 1173186 at *1, Wall, 379 F.3d at 559 (emphasis added). The policy before me does not contain the "risks of" phrase, which I consider significant. Richardson concluded that both "collapse" and "risks of direct physical loss involving collapse" were ambiguous. Richardson, 2004 WL 1173186 at *3. I agree with this conclusion. The courts noted the "clear modern trend," id., and the "growing majority of jurisdictions," Wall, 379 F.3d at 561, which have broadened the interpretation of "collapse" beyond actual collapse or falling to the ground. Richardson adopted a definition of "substantial impairment to the structural integrity of a property." Richardson, 2004 WL 1173186 at *4. Wall adopted a definition of "imminent collapse." Wall, 379 F.3d at 563. Although Richardson and Wall do rely on the "risks of" language, nothing in either opinion can be read to exclude coverage if the "risks of" language is not present in the policy.

The controversy surrounding the definition of "collapse" began prior to 1960. See Government Employees Insurance Co. v. DeJames, 261 A.2d 747, 751 (Md. 1970) (citing cases as early as 1958). Particularly with this much warning, the insurer is capable of unambiguously limiting collapse coverage if it wishes to do so. See Rosen v. State Farm General Insurance Co., 70 P.3d 351, 353 (Cal. 2003) (no coverage for imminent collapse of a deck when policy stated "We insure only for direct physical loss to covered property involving the sudden, entire collapse

PAGE 10 - OPINION

of a building or any part of a building. Collapse means *actually fallen down or fallen into pieces*.") (emphasis in original).

I asked the parties to direct me to cases involving policies which do not contain the "risks of" language. The Schrays rely on American Concept Insurance Co. v. Jones, 935 F. Supp. 1220 (D. Utah 1996), in which the policy stated, "We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following . . . . Collapse does not include settling, cracking, shrinking, bulging or expansion." Id. at 1225. That is identical to the language in the policy before me. The insurer in American Concept also argued that the coverage only applies if the insured building is reduced to a flattened form or rubble, namely, an actual collapse. Id. at 1227. The court concluded that Utah would follow what it deemed "the modern trend" and would apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity. Id. at 1228. The court reasoned: (1) the policy did not contain a definition limiting collapse coverage to a flattened form or rubble; (2) the policy's use of the term collapse is fairly susceptible to being interpreted as including settling or cracking that results in substantial impairment of the structural integrity, as opposed to mere settling or cracking; (3) some dictionary definitions of collapse–a breakdown in strength–support the interpretation of a substantial impairment of structural integrity; (4) requiring a building to fall down before allowing coverage conflicts with the insured's duty to mitigate damages; and (5) requiring a flattened form or rubble would render some of the coverage illusory. Id. at 1227-28.

The Schrays also note Weiner v. Selective Way Insurance Co., 793 A.2d 434, 443 (Del. Super. Ct. 2002) (in a policy without the "risks of" language, collapse coverage applies when the

building has any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building).

The insurer provided two cases which it acknowledged are not as close to the precise issue. Beach v. Middlesex Mutual Assurance Co., 532 A.2d 1297 (Conn. 1987) (collapse in ensuing loss provision); Government Employees Insurance Co., 261 A.2d 747 (collapse as part of general insuring provision and not as an additional coverage).

After reviewing the trend in the case law, I conclude that the Oregon Supreme Court would also follow the modern trend and apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity. I also adopt the well-stated reasoning in American Concept.

Based on this interpretation of the policy, there is a factual issue on whether substantial impairment to the structural integrity of the house has occurred, triggering the collapse provision. Consequently, coverage cannot be determined as a matter of law. Likewise, assuming that substantial impairment has occurred, there is a factual issue on when it happened. Thus, I cannot make any rulings based on the suit limitation provision.

///

///

///

## CONCLUSION

Defendant's Motion to Strike (#52) is denied. Plaintiff's Motion to Supplement Declarations (#54) is granted. Defendant's Motion for Summary Judgment (#24) is denied. The complaint is amended by interlineation to substitute American Automobile Insurance Company for defendant Fireman's Fund Insurance Company.

IT IS SO ORDERED.

Dated this    22nd    day of November, 2005.

                                            /s/ Garr M. King
                                            Garr M. King
                                            United States District Judge